AO 106 (Rev. 04/10) Application for a Search Warrant

## UNITED STATES DISTRICT COURT
for the
Western District of Arkansas
Fort Smith Division

| | |
|---|---|
| In the Matter of the Search of<br>One (1) cream-colored Apple iPhone<br>cellular telephone, IMEI: unknown,<br>model: 16 Pro; One (1) gray-colored<br>Motorola cellular telephone, IMEI:<br>354033985406316, model: XT2417-2;<br>One (1) gray-colored Samsung cellular<br>telephone, IMEI: 351203499931678,<br>model: SM-S921U; One (1) black-colored<br>Samsung cellular telephone, IMEI:<br>357973425680532, model: unknown; and<br>One (1) black-colored Garmin dezl Global<br>Positioning System (GPS) device, SN:<br>Unknown | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No.   2:25cm00007 |

**FILED**

**United States District Court**

**Western District of Arkansas**

February 04 2025

**Office of the Clerk**

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe property to be searched and give its location)*: **See Attachment A**

located in the Western District of Arkansas, there is now concealed *(identify the person or describe the property to be seized)*: **See Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    √   evidence of a crime;

    √   contraband, fruits of crime, or other items illegally possessed;

    √   property designed for use, intended for use, or used in committing a crime;

    ☐   a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Deliver Controlled Substances |
| 21 U.S.C. § 846 | Conspiracy to Deliver Controlled Substances |

The application is based on these facts:

    √   Continued on the attached sheet. Affidavit of DEA Special Agent Michael Brooks.

    ☐   Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DEA Special Agent Michael Brooks
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  _2/4/25_____

_____
*Judge's signature*

City and state: Fort Smith, Arkansas____

___Hon. Mark E. Ford, U.S. Magistrate Judge_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Michael Brooks, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      Your Affiant is a Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA") and has been employed with the DEA since June 2019. Your Affiant is a criminal investigator for the United States within the meaning of Title 21, United States Code, Section 878, and therefore your affiant is empowered to conduct investigations of, and make arrests for, the offenses enumerated in Title 21. Accordingly, your Affiant is a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a seizure warrant.

3.      Your Affiant began his career as a Special Agent with the DEA in October of 2019. Your Affiant received sixteen weeks of training at the DEA Academy in Quantico, Virginia, where your Affiant learned to identify various types of controlled substances by sight and odor; the way in which controlled substances are packaged, marketed, and consumed; drug testing; informant handling; evidence handling; search and seizure law; law involving conspiracy; and surveillance and investigation techniques.

4.      Prior to your Affiant's employment with the DEA, your Affiant was employed by the North Little Rock, Arkansas, Police Department since 2007. During your Affiant's

employment with the North Little Rock Police Department, your Affiant was assigned to the DEA Little Rock District Office as a Task Force Officer (TFO) from June 2014 until June 2019.  Prior to your Affiant's assignment as a DEA TFO, your affiant was assigned to the North Little Rock Police Department's Narcotics Unit from December 2009 until June 2014. Your Affiant has been involved in numerous aspects of drug investigations, including, but not limited to, conducting controlled purchases of narcotics; utilizing confidential sources; debriefing defendants, witnesses, and informants; conducting surveillance and undercover operations; preparing and executing search warrants; analyzing documentary and physical evidence, analyzing phone toll records; and conducting wiretap investigations.

5.     In the course of your Affiant's career, your Affiant has been the Affiant of, and/or participated in, numerous search warrants involving the law enforcement seizure of controlled substances, documents associated with the sale of controlled substances and proceeds from the sale of illicit drugs.

6.     Your Affiant has personally conducted and/or assisted in over 200 investigations of criminal violations involving violations of the Federal Controlled Substances Act (Title 21, U.S.C. §§ 841(a)(1) et. al.).

7.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8.     The property to be searched are:

a.     One (1) cream-colored Apple iPhone cellular telephone, IMEI: unknown, model: 16 Pro (hereinafter "Target Telephone #1");

      b.     One   (1)   gray-colored   Motorola   cellular   telephone,   IMEI: 354033985406316, model: XT2417-2 (hereinafter "Target Telephone #2");

      c.     One   (1)   gray-colored   Samsung   cellular   telephone,   IMEI: 351203499931678, model: SM-S921U (hereinafter "Target Telephone #3");

      d.     One   (1)   black-colored   Samsung   cellular   telephone,   IMEI: 357973425680532, model: unknown (hereinafter "Target Telephone #4"); and

      e.     One (1) black-colored Garmin dezl Global Positioning System (GPS) device, SN: unknown (hereinafter "Garmin GPS").

(collectively "Target Telephones" and "Garmin GPS"), all currently being stored as evidence in Fort Smith, Arkansas, which is in the Western District of Arkansas, Fort Smith Division, which are further described in Attachment A.

      9.     The applied-for warrant would authorize the forensic examination of the Target Telephones and Garmin GPS for the purpose of identifying electronically stored data particularly described in Attachment B for violations of 21 U.S.C. § 841 (a)(1), Possession with Intent to Distribute a Controlled Substance and 21 U.S.C. § 846, Conspiracy to Distribute a Controlled Substance.

## PROBABLE CAUSE

      10.     On January 27, 2025, Arkansas State Police (ASP) Corporal (Cpl.) Chris Short was conducting highway patrol on Interstate 40, when he observed a 2021 Peterbilt tractor and trailer fail to maintain its lane of traffic, swerving outside the designated travel lane multiple times. The tractor displayed an Arizona license plate of AM59015 (registered to JUAN CEBALLOS-CONTRERAS to an address in Tucson, AZ). The trailer displayed an Arizona license plate of

AKA42Y (registered to Premier Distribution Center LLC to an address in Nogales, AZ). Cpl. Short initiated a traffic stop based on the failure to maintain lane offenses.

11.    Cpl. Short identified the driver of this vehicle as the owner of this vehicle, JUAN CEBALLOS-CONTRERAS (hereinafter "CEBALLOS-CONTRERAS"). Upon contact with CEBALLOS-CONTRERAS, Cpl. Short noticed CEBALLOS-CONTRERAS' hands were shaking, a sign of being nervous. Cpl. Short identified the passenger of this vehicle as ESTEBAN CEBALLOS-CONTRERAS. Cpl. Short observed ESTABAN CEBALLOS-CONTRERAS to be in the back sleeper area of the tractor vehicle. Cpl. Short noticed Esteban CEBALLOS-CONTRERAS would not make eye-contact with Cpl. Short.

12.    Cpl. Short learned that both occupants identified themselves as brothers.

13.    Cpl. Short learned that Esteban CEBALLOS-CONTRERAS did not have a Commercial Driver's License (CDL) and was just along for the ride. According to Cpl. Short's training and experiences, a passenger along for the ride without a CDL is not normal in the trucking industry.

14.    CEBALLOS-CONTRERAS agreed to accompany Cpl. Short back to his patrol unit, while Cpl. Short checked his documents, logbook, and driver's license status. While speaking in Cpl. Short's patrol unit, Cpl. Short could see CEBALLOS-CONTRERAS' carotid artery pumping in his neck. CEBALLOS-CONTRERAS remained nervous throughout the stop, even after Cpl. Short informed CEBALLOS-CONTRERAS he only intended of writing CEBALLOS-CONTRERAS a traffic warning.

15.    CEBALLOS-CONTRERAS informed Cpl. Short he was travelling from California to College Park, Georgia. Cpl. Short found this odd because the bill of lading showed CEBALLOS-CONTRERAS was travelling from Santa Paula, California to Issaquah, Washington.

16.     Further inspection of CEBALLOS-CONTRERAS' logbook revealed that in the past 14 days, 5 of these days CEBALLOS-CONTRERAS noted he was off work, 3 of these days CEBALLOS-CONTRERAS noted he had only driven 3 hours or less. Cpl. Short also noticed CEBALLOS-CONTRERAS noted in his logbook that he was using this truck as personal use in Tucson, Arizona on his days off work.  Cpl. Short found this odd because CEBALLOS-CONTRERAS is from California and Tucson, Arizona is known to Cpl. Short as a major hub for illegal drugs.

17.     During a criminal history check, Cpl. Short found where Esteban CEBALLOS-CONTRERAS was previously arrested by Metro Counter Narcotics (Tucson, Arizona) for Money laundering – Conceal Proceeds (felony).

18.     Cpl. Short contacted Drug Enforcement Administration (DEA) Special Agent Mike Brooks and requested a name check through DEA databases.  SA Mike Brooks received information from out-of-state DEA agents identifying CEBALLOS-CONTRERAS and ESTEBAN CEBALLOS-CONTRERAS as being suspected drug traffickers.

19.     Cpl. Short then asked CEBALLOS-CONTRERAS for his consent for law enforcement to search the truck and trailer. CEBALLOS-CONTRERAS provided Cpl. Short with his consent for this search.

20.     During the initial search, Target Telephone #1 was located in a cellular telephone holder affixed to the dashboard, which was angled toward the driver's seat of the tractor truck. Troopers also located Target Telephone #2 above the driver's side windshield in a storage compartment where CEBALLOS-CONTRERAS was previously seated.

21.     During a search of the sleeper area of the truck, troopers located several kilogram bundles of suspected drugs concealed behind a plastic wall of the sleeper's closet. This closet had

clothes and suitcases inside of it. Upon the discovery of the kilogram bundles of suspected drugs, CEBALLOS-CONTRERAS and Esteban CEBALLOS-CONTRERAS were arrested. CEBALLOS-CONTRERAS never asked why he was being arrested until Cpl. Short placed him in the back of Cpl. Short's patrol unit. Esteban CEBALLOS-CONTRERAS never said a word to Cpl. Short upon his arrest.

22.    During a search of Esteban CEBALLOS-CONTRERAS, incident to arrest, troopers located Target Telephone #3.

23.    During a further search of the tractor truck, SA Matt Barden located Target Telephone #4 in a cabinet drawer, next to the bed of the sleeper where Cpl. Short initially observed Esteban CEBALLOS-CONTRERAS.

24.    During a further search of the tractor and trailer, troopers and other assisting law enforcement located additional kilogram bundles of suspected drugs concealed in the passenger side wall and rear wall of the sleeper area. A total of forty (40) kilogram bundles were located and seized from the truck.

25.    The Garmin GPS was also found affixed to a holder connected to the inside of the windshield of the tractor trailer. The Garmin GPS was also seized by law enforcement.

26.    One of the kilogram bundles was later field-tested using a Narcotics Detection Itemiser, which resulted in a positive result for the presence of cocaine. A second kilogram bundle was also field-tested using a TruNarc handheld narcotics analyzer, which resulted in a positive result for the presence of cocaine.

27.    CEBALLOS-CONTRERAS and Esteban CEBALLOS-CONTRERAS were transported to the Crawford County, Arkansas, Sheriff's Office, along with the tractor and trailer CEBALLOS-CONTRERAS was driving.

28.     All subjects were later booked into the Crawford County, Arkansas, Detention Center on drug-related State charges.

## THE NATURE OF CONTROLLED SUBSTANCE OFFENSES GENERALLY

29.     Based upon your affiant's training, experience, shared experience with other agents and officers with whom he has worked, and participation in other investigations involving large amounts of controlled substances, your affiant knows the following to be true:

a.     That drug distributors often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by law enforcement authorities;

b.     That even though these assets are in names other than the drug distributors, the drug distributors actually own and continue to use these assets, and exercise dominion and control over them;

c.     That drug distributors often possess large amounts of United States currency in order to maintain and finance their on-going drug business;

d.     That it is common for drug distributors to maintain books, records, receipts, notes, ledgers, addresses and locations, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other records relating to the acquisition, transportation, ordering, sale and distribution of controlled substances. That the aforementioned records are maintained where the traffickers have ready access to them;

e.     That it is common for drug distributors to conceal records of drug transactions in secure locations within their residences, their businesses, their vehicles, their electronic devices, such as cellular phones, and other locations which they maintain

dominion and control over for ready access, and to conceal these items from law enforcement authorities;

f.      That it is common for persons involved in drug distribution to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals, and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements, and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the drug distributors within their residences, vehicles, businesses or other locations, which they maintain dominion and control over;

g.      That drug distributors often utilize electronic equipment such as cellular telephones, SIM cards, computers, flash drives, external hard drives, multimedia devices, GPS devices, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in items a, b, d, e, and f, above, and n and o, below;

h.      That when drug distributors amass large proceeds from the sale of drugs, the drug distributors may attempt to legitimize these profits through various money laundering methods. To accomplish these goals, drug distributors utilize, including but not limited to, domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations, business fronts, and otherwise legitimate businesses which generate large quantities of currency;

i.      That the sale of Controlled Dangerous Substances generates large quantities of United States currency in small denominations (commonly referred to as "street money");

j.      That distributors of illegal drugs commonly maintain addresses or telephone numbers in books or papers ("ledgers") which reflect names, addresses and/or telephone numbers of their associates in the drug trafficking organization;

k.      That drug distributors take or cause to be taken photographs of themselves, their associates, their property and their product. That these distributors usually maintain these photographs in their possession, or in their residences and/or vehicles;

l.      That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;[1]

m.      That drug distributors commonly have in their possession, that is, on their person, at their residences, in their vehicles, and/or their businesses, firearms, including but not limited to:  handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons.  Said firearms are used to protect and secure a drug distributor's property.  Such property may include, but is not limited to: illegal drugs, jewelry, vehicles, narcotics paraphernalia, books, records, and United States currency;

n.      That drug proceeds are commonly transported back to border or source states within the United States. This is normally seen on our interstates as travel westbound or southbound; whereas, drug trafficking is normally seen on our interstates as travel eastbound or northbound;

---

[1] *United States v. Rodriguez*, 484 F.3d 1006, 1012-1013 (8th Cir. 2007).

        o.      That those involved in drug trafficking and illicit bulk-currency movement, have been known to be in possession of firearms, which are used to protect themselves when possessing large amounts of illicit proceeds; and

        p.      That those involved in drug trafficking activities often carry more than one cellular telephone. This technique is used so that these individuals can dedicate one phone to personal communications, and one phone to illicit activity communications. Your Affiant has also conducted investigations where these individuals dedicate one phone for their drug sources of supply and one phone for their drug customers.

### CELLULAR PHONES AND DRUG TRAFFICKING

30.      From my training and experience in conducting numerous drug trafficking investigations, your Affiant is aware that traffickers of illegal narcotics frequently utilize cellular telephones to facilitate the purchase, transportation, and/or distribution of illegal narcotics and the proceeds thereof. Specifically, your Affiant is aware the drug traffickers often utilize multiple cellular telephones to communicate with co-conspirators during the transport of illegal narcotics and the proceeds thereof to avoid detection and to differentiate between types of transactions, end-user, sources of supply, and the location for the delivery of illegal narcotics and the proceeds of illicit sales.

31.      Furthermore, cellular telephones frequently contain names, text messages, voice mail messages, photographs, videos, and contact numbers of others involved in the distribution of illegal narcotics.

32.      It is both your Affiant's experience and the experience of other law enforcement officers your Affiant has spoken with, that a conspiracy to traffic narcotics generates various types of cellular telephone-related evidence. For example, the following types of evidence may be

generated during the conspiracy: (1) telephone and direct contact numbers; (2) identifying information assigned to the device (including usernames, passwords and e-mail addresses); (3) call detail information (outgoing/incoming/missed calls); (4) internet protocol addresses accessed by the device or accessing the device; (5) stored photographs, videos and text messages; (6) stored electronic mail, including attachments, and voice messages and other recordings; (7) web browsing history and any stored web pages; (8) stored documents and other files; (9) stored geo-location information; and (10) similar data stored in other applications.

33.    Based upon your Affiant's training and experience, your Affiant also knows that members of drug trafficking organizations, including dealers, often use mobile phones to communicate with their narcotics source of supply and delivery recipients. Drug distributors often use SMS text messaging to communicate arrival and departure times, meeting places, details about narcotics, and details about other co-conspirators involved in the distribution of narcotics.

34.    Your Affiant has also observed drug distributors who photograph large sums of U.S. Currency and/or narcotics, which are then stored on the mobile device.

## TECHNICAL TERMS

35.    Based on your Affiant's training and experience, your Affiant uses the following technical terms to convey the following meanings:

q.    *Wireless telephone.* A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice

communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

r.      *Digital camera.* A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

s.      *Portable media player.* A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

t.      *GPS.*  A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

u.      *PDA.*  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

v.     *Internet.* The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

36.     Based on your Affiant's training and experience your Affiant knows that the Target Telephones have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, and are capable of storing text messages and digital images of, or related to, narcotics possession or distribution. Additionally, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Your Affiant also knows that the Garmin GPS has the capability maintaining historical location information, and other input information that can uncover, among other things, evidence that reveals of suggests where the subjects in this investigation travelled to or intended to travel to.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

37.     Based on your Affiant's knowledge, training, and experience, your Affiant knows that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

38.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the Target Telephones and Garmin GPS were used, the purpose of their use, who used them, and when. There

is probable cause to believe that this forensic electronic evidence might be on the Target Telephones and Garmin GPS because:

      a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

      b.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence in analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

      c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic device was used, the purpose of their use, who used them, and when.

      d.    The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a wireless telephone is evidence may depend on other information stored on the wireless telephone and the application of knowledge about how a wireless telephone operates. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on storage medium.

39.    *Nature of examination.* Based on the foregoing, and consistent with Federal Rule of Criminal Procedure 41(e)(2)(B), the warrant your Affiant is applying for would permit the examination of the device consistent with this warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

40.    *Manner of execution.* Because this warrant seeks only permission to examine a device that is already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, your Affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

41.    Your Affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Telephones and Garmin GPS described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

M.Brooks

Michael Brooks
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on February 4, 2025

HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

The property to be search are:

Target Telephone #1: One (1) cream-colored Apple iPhone cellular telephone, IMEI: unknown, model: 16 Pro;

Target Telephone #2: One (1) gray-colored Motorola cellular telephone, IMEI: 354033985406316, model: XT2417-2;

Target Telephone #3: One (1) gray-colored Samsung cellular telephone, IMEI: 351203499931678, model: SM-S921U;

Target Telephone #4: One (1) black-colored Samsung cellular telephone, IMEI: 357973425680532, model: unknown; and

Garmin GPS: One (1) black-colored Garmin dezl Global Positioning System (GPS) device, SN: unknown.







The Target Telephones and Garmin GPS are currently being stored as evidence in Fort Smith, Arkansas, which is in the Western District of Arkansas, Fort Smith Division.

### ATTACHMENT B

1.      All records on the Target Telephones and Garmin GPS described in Attachment A that relate to violations of 21 U.S.C. § 841 (a)(1), Possession of a Controlled Substance with Intent to Deliver and 21 U.S.C. § 846, Conspiracy to Distribute a Controlled Substance and involve Juan CEBALLOS-CERVANTES and Esteban Isidro CEBALLOS-CERVANTES, including:

a.      Dialed outgoing telephone/pager numbers;

b.      Incoming telephone/pager numbers;

c.      Missed incoming telephone/pager numbers;

d.      Numeric/alphanumeric messages sent or received;

e.      Verbal messages sent or received;

f.      Address and telephone/pager number listings;

g.      Electronically composed memorandum;

h.      Time and/or data markings to include calendar format organization of all such data;

i.      Phone book listings to include names, aliases, telephone/pager numbers, codes, types of phone numbers and addresses;

j.      Photos and videos;

k.      Historical GPS locations;

l.      Internet web browser history data;

m.      Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

n.      Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

o.    Any information recording Juan CEBALLOS-CERVANTES and Esteban Isidro CEBALLOS-CERVANTES's purpose of travel at the time of the traffic stop; and

p.    All bank records, checks, credit card bills, account information, and other financial records that could be related to the laundering of drug proceeds.

2.    Evidence of user attribution showing who used or owned the Target Telephones and Garmin GPS at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.